UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No: 13-cv-27-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM** |
| | ) | **OPINION** |
| DR. PHILIP ROBINSON, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Defendant Dr. Philip Robinson's Motion for

Summary Judgment.  [R. 41].  For the reasons set forth herein, his motion is DENIED.

**I**

This case concerns a suit which the United States brought against Dr. Philip Robinson

and his employer, Associates in Eye Care, P.S.C. (AEC)[1] under the False Claims Act, 31 U.S.C.

§§ 3729-33 (FCA), and under common law theories of payment by mistake and unjust

enrichment.  [R. 1.]  Doctor Robinson is an optometrist who provided optometric services to

nursing home residents on a full-time basis through the relevant time period of January 1, 2007

through January 31, 2012.  [R. 41-1 at 4; R. 45 at 2.]  During this time, Robinson was employed

by AEC, which is a practice group of optometrists, and he also owned 10% of its outstanding

stock.  [R. 45 at 2; R. 45-1.]  Robinson assigned his right to bill Medicare to AEC, who then paid

Robinson about 65% of the net revenue received.  [*Id*.]

---

[1] AEC has since settled.  [R. 51.]

Robinson's practice was to travel to various nursing homes, where he treated mainly long-term patients suffering from multiple conditions including dementia. [R. 41-1 at 4.] Robinson hired assistants, one of whom typically accompanied him to the nursing home to help fill out charts, transport equipment, and locate patients but did not assist with the examinations themselves. [*Id.*; R. 45 at 3.] During most of the relevant time period, Dr. Robinson was assisted by either Brittany McKee or Stacy Boyd. [R. 45 at 4.] Robinson provided regular services to fourteen separate nursing homes during the relevant period. [R. 41-1 at 4.] The closest nursing homes were in Somerset, Kentucky, where the AEC office was located, but several of the nursing homes Dr. Robinson regularly visited were over 60 minutes or more away. [R. 46-3 at 29-30.] According to his assistants, upon arriving at the nursing home, Dr. Robinson typically consulted with the staff and prepared a cart of equipment before beginning his examinations. [R. 45 at 4.] The patients he intended to see were designated on follow-up lists with each patient's name and when he thought he should examine them again. [*Id.*; R. 41-1 at 4.] As the United States points out, and Dr. Robinson does not dispute, he typically indicated on the list that he should examine them at the "next visit," which almost always occurred four to six weeks later. [R. 45 at 4.] Dr. Robinson's practice was to go door-to-door down a hallway and examine patients in their rooms, according to their names on the follow-up lists. [*Id.*] In this way, his records reflect that he provided some form of eye examination to almost all of his nursing home patients every four to six weeks, and only rarely did he note that the next examination should occur later than the "next visit." [*Id.* at 4-5.]

Doctor Robinson's method of documenting his patients' treatment also bears particular relevance to this case. Dr. Robinson does not dispute that the United States' exhibits [R. 46-8, R. 46-9] are representative of his documentation methods, and from those exhibits and his

assistants' deposition testimony [R. 46-3 at 14-15; R. 46-4] it appears Dr. Robinson or his assistant typically listed the patient's name, facility, examination date, and the patient's chief complaint on examination forms which were filled out for each patient.  Much of the time the patient's complaint was documented as "follow-up" (F/U) for previous conditions rather than a new complaint.  [R. 46-8, R. 46-9.]  Many patients appear to have been unable to communicate a complaint at all and were described as disoriented, confused, or non-responsive.  [*Id*.]  For many of the patients the examination forms also indicate that there was no change in their history from the first time they were examined by Dr. Robinson.  [*See, e.g*., R. 46-8 at 5.]  Additionally, the assistant typically would complete an "Assessment" portion of the form documenting the patient's diagnoses, which were then assigned numbers.  [R. 46-8, R. 46-9, R. 46-3 at 54-55; R. 46-4 at 62.]  After examining all the patients on a hall, floor, or wing, Dr. Robinson completed the forms by describing the examination and the proposed treatment plan, which for most patients was simply to "monitor" them [R. 46-3 at 54-57; R. 46-4 at 60-61], and also noted when a follow-up examination should occur which for almost all his patients was at the "next visit," approximately four to six weeks later.  [R. 41-6 at 8-9, 46-6, R. 46-7, R. 46-8, R. 46-9.]  According to his assistants, Dr. Robinson and his assistant also took a lunch break every day for about thirty minutes, and after lunch would either examine more patients, or would travel to a second nursing home to repeat the routine. [R. 46-5 at 4; R. 56-4 at 77.]

According to his records, Dr. Robinson routinely saw more than 60 patients per day, for whom he later billed Medicare, and on fifteen particular days within the relevant period he claimed to have examined over 90 patients who were Medicare beneficiaries.  [R. 45-2 at 2-3.]  One particular day described in the Complaint was May 28, 2008, when Dr. Robinson claimed to have examined 117 Medicare beneficiaries.  [*Id*.; R. 1 at 13.]  The United States takes issue with

3

how much time he logistically could have spent with each patient.  Based on the assistants'
testimony, Dr. Robinson and his assistant usually left to visit the nursing homes by 8:00 or 8:30
a.m. at the latest, and often left earlier than 8:00 a.m. when visiting those that were further away.
[R. 46-3 at 12.]  According to the time sheets the assistants filled out each day, Dr. Robinson
would spend between 10 and 45 minutes talking to nursing home staff upon his arrival [R. 46-4
at 38-39], and his documentation of his services after visiting a particular hall or floor took
between 30 and 60 minutes.  [*Id*. at 77-78; R. 46-3 at 57.]  The time sheets also reflect the time
the assistants spent preparing equipment, time spent on lunch breaks, travel time to the nursing
homes, and travel time back to AEC at the end of the day.  Doctor Robinson does not challenge
the accuracy of these time sheets, and based on these reports, some objective limits to the time
spent examining patients can be ascertained.

Also of particular relevance to this case is the way Dr. Robinson's claims were billed.
Most of the claims at issue were billed to Medicare using the following CPT codes: 92012,
92014, 99308, and 99309.  [R. 45 at 3; R. 45-2.]  These codes were chosen by either Dr.
Robinson or by Stacy Boyd, who admitted she had no formal training in Medicare coding and
simply entered the codes the way Dr. Robinson taught her. [R. 46-4 at 91-97.]  A total number of
25,779 claims were billed to those four codes for Dr. Robinson's services during the relevant
time period, for which Medicare paid AEC $1,449,488.29.  [R. 45-3 at 59, 107, 113.]  In early
2007 and early 2008, Medicare contractors audited Dr. Robinson and concluded that 35 of the 96
services they reviewed should have been downcoded or denied.  [R. 46-11 at 49-52.]  AEC chose
not to appeal the finding, but in 2009 AEC retained a third party consultant, Soterion Medical
Services, to review a random sampling of Dr. Robinson's services to nursing home patients.  [*Id*.
at 53.]  Soterion advised AEC that the audit's results were not sufficient to sustain an appeal to

recoup denied payments, that "a more thorough understanding of the parameters required by CMS" was necessary to avoid frequent audits in the future, and that "[a]ccurate coding . . . is extremely important because it must ensure full compliance with the law." [R. 46-13 at 1.] The August 2009 results of the Soterion audit emphasized "the absolute importance of reviewing all records for medical necessity and documentation prior to assigning codes and submitting the charges to the payer," and gave a lengthy description of how to more accurately assign billing codes in order to avoid further audits. [*Id*.; R. 14-1; R. 12-2.] In October 2009, yet another CMS contractor, AdvanceMED PSC, reviewed AEC's claims to Medicare for Dr. Robinson's services to nursing home patients by examining 24 services provided to two patients over the course of a year. [R. 46-14.] As a result, AdvanceMED deemed 23 of those services were not medically necessary and eventually referred the matter to law enforcement. [*Id*.; R. 46-15 at 91-93.]

Presently before the Court is the United States' allegation that Dr. Robinson violated the False Claims Act by submitting claims to Medicare that sought payment for routine services to nursing home residents that were not reasonable or necessary, or were for a type or level of service that was not actually provided. [R. 1 at 22.] In particular, the United States claims that on certain days during the relevant period, Dr. Robinson claimed to examine such a high number of patients that either he could not possibly have provided such services under the circumstances, and/or such services were so cursory as to render them worthless. [R. 1 at 1-2; R. 45 at 7-9.] Additionally the United States alleges that Dr. Robinson knew or should have known of the falsity of these claims. [R. 1 at 22.]

In moving for summary judgment, Dr. Robinson first claims that the United States cannot produce any objective evidence that the services billed to Medicare were not medically necessary. [R. 41-1 at 1.] In particular, concerning his services on two specific high-volume

days, he claims that there is no genuine issue of material fact concerning the necessity of those services, and that the United States also cannot prove Dr. Robinson's knowledge or intent for purposes of the FCA based on the volume of patients seen in a given day. [R. 41-1 at 1-2.] Finally, Dr. Robinson also contends that the United States is improperly attempting to extrapolate damages from a sample of thirty claims, which he claims is insufficient for establishing a violation of the FCA. [*Id*. at 2.]

## II

## A

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D.Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding*, 285 F.3d 415, 424 (6th Cir. 2002). Moreover, the movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden,

the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Holding Hall*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). The non-moving party, however, "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Holding Hall*, 285 F.3d at 424 (internal citations omitted).

Finally, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). In reviewing a motion for summary judgment, the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

**B**

Under the False Claims Act (FCA), any person or entity "who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States government for a specified civil penalty, plus two or three times the amount of damages which that person's fraudulent acts caused the government to sustain. 31 U.S.C. § 3729(a)(1)(A)-(B)(C). For purposes of the FCA, the term "knowingly" means that the person or entity "has actual knowledge of the information," or acts "in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). To act "knowingly" requires "no proof of

specific intent to defraud."  31 U.S.C. § 3729(b)(1)(B); *see also United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 356 (6th Cir. 2012) ("[N]o proof of specific intent to defraud is required for an FCA claim" because reckless disregard will satisfy the intent requirement as well) (internal quotations omitted).

Accordingly, the Sixth Circuit, as well as several other Circuits, have commonly held that the requisite elements of a FCA claim are as follows: "(1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken 'knowingly,' i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007); *see also United States v. Villaspring Health Care Center, Inc.*, 2011 WL 6337455, at *1 (E.D. Ky. Dec. 19, 2011) (quoting *Bledsoe*, 501 F.3d at 503).  Moreover, the alleged falsity must be "material" to the claim for payment in order to be actionable under the FCA.  *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d at 444; *see also United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 528 (6th Cir. 2012).  For purposes of the FCA, "'a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *United States ex rel. Wall*, 697 F.3d at 356 (quoting *United States ex rel. A+ Homecare, Inc.*, 400 F.3d at 445).

## C

In the first of his three arguments in support of his motion for summary judgment, Dr. Robinson contends that the United States cannot show that the claims at issue were false under the FCA because it cannot establish that his services were not medically necessary.  [R. 41-1 at 4-7.]  Specifically, Dr. Robinson argues that the FCA requires proof of an objective falsehood,

which the United States cannot provide because the necessity of each claim at issue is a subjective determination made by the medical professional on a patient-by-patient basis.  [*Id*. at 5-6.]  Dr. Robinson further contends that the opinion testimony of Dr. Mark Dickinson is "insufficient" to establish that the claims lacked medical necessity, because necessity of services is "an individualized assessment" for which there "are no recognized objective criteria."  [*Id*. at 6-7.]  In response, the United States contends that not only is Dr. Dickinson's testimony sufficient to create an issue of material fact as to the medical necessity of many of Dr. Robinson's services, but also the deposition testimony from a number of Dr, Robinson's colleagues and the results from the review conducted by AdvanceMed all provide sufficient evidence that a significant number of the examinations at issue were unnecessary and unreasonable.  [R. 45 at 17.]

First, contrary to Dr. Robinson's argument, proof of an objective falsehood is not the only means of establishing an FCA claim.  In the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert—White Co.,* 390 U.S. 228, 232, (1968)).  "Falsity" can be shown by an express false certification or it can also be established through a theory of implied certification, which "holds a defendant liable for violating the continuing duty to comply with the regulations on which payment is conditioned."  *United States ex rel. Wall*, 697 F.3d at 356 (internal quotation marks and citations omitted).  One "common form of Medicare fraud" is that of "upcoding," which is "the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided."  *U.S. ex rel. Bledsoe*, 501 F.3d at 498 n.2 (internal quotations and quotation marks

omitted). Thus, even if the question of whether Dr. Robinson's services were necessary involves some measure of a subjective determination on his part, if the United States can show that Dr. Robinson violated his "continuing duty to comply with the regulations on which payment is conditioned," *United States ex rel. Wall*, 697 F.3d at 356, or that he engaged in "upcoding" his services, *U.S. ex rel. Bledsoe*, 501 F.3d at 498, such falsity is sufficient for an FCA claim.

Second, Congress has specifically prohibited payment of any Medicare claim for "items or services which . . .  are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C. § 1395y(a)(1)(A).  The United States has presented testimony from several witnesses whose deposition testimony contradicts Dr. Robinson's assertion that all of the services he provided were reasonable and necessary.  The United States' medical expert Dr. Dickinson examined a random sampling of Dr. Robinson's nursing home examinations billed to Medicare with the four CPT codes discussed above during the relevant time period.[2]  [R. 41-3.] For the thirty sample examinations reviewed, Dr. Dickinson documented his findings and explained in detail the reasons for his conclusion that twenty-five of them were not medically necessary.  [*Id*. at 3-12.]  Doctor Dickinson also opined that the frequency of examining nearly all of Dr. Robinson's nursing home patients on a monthly basis was "unreasonable for most of those patients," and that Dr. Robinson's examinations "appeared to be cursory, brief in duration," and that patients who do have a medical need for frequent eye examinations "typically require a more involved exam than what Dr. Robinson was routinely providing."  [*Id*. at 14.]

Doctor Robinson contends that such testimony "is an insufficient method to prove the 'falsity' of any individual claim in this case," and he apparently bases this argument primarily on

---

[2] The United States submitted deposition testimony from statistician Erika Halsey validating that this was a statistically valid sampling of examinations and that the sample was truly random and unbiased.  [R. 45-3.] Dr. Robinson has presented no proof that this conclusion is flawed, nor does he challenge the method of obtaining the sample.  His arguments concerning the propriety of extrapolation in general are further addressed below.

the allegation that his determinations concerning the necessary care for each patient were made on a subjective, individualized basis.  [R. 41-1 at 6-7.]  For purposes of summary judgment, however, the United States as the non-moving party only needs to "set forth specific facts showing there is a genuine issue for trial."  Fed.R.Civ.P. 56(e); *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).  Although Dr. Robinson claims Dr. Dickinson's opinion does not constitute sufficient evidence for purposes of determining medical necessity, he points to no legal authority explaining how it is not valid or why it is inadmissible.  The question is not whether Dr. Dickinson's opinion testimony about 30 examinations proves the lack of medical necessity beyond all doubt, but whether it creates an issue of material fact that should be submitted to a jury.  Although Dr. Dickinson alone may not have proved definitively that each of the over 25,000 claims at issue were unreasonable or unnecessary, such proof is unnecessary at this stage of litigation.  The United States simply must present evidence of a genuine issue of a material fact, and Dr. Dickinson's opinion testimony at the very least creates a genuine dispute concerning the necessity of the 30 claims he reviewed, and also as to whether Dr. Robinson acted with reckless disregard to the truth in his billing practices.  Such evidence fulfills the government's affirmative duty in this matter.  *See Hall Holding*, 285 F.3d at 424.

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F.App'x 450, 452 (6th Cir. 2013).  "Courts may not resolve credibility disputes on summary judgment."  *Id.*  Because Dr. Robinson does not challenge Dr. Dickinson's qualifications or the admissibility of his testimony, but simply asserts it is insufficient "proof" of the government's claim, the issue raised by Dr. Dickinson's opinion evidence is one of credibility and of the weight that should be given to his opinion.  "[I]f conflicting testimony

appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Keene, *Federal Practice & Procedure* § 2726, at 447 (3d ed. 1998) (internal quotation marks omitted).  The fact that Dr. Robinson's individual assessment of whether the examinations at issue were necessary or reasonable contradicts the individual assessment contained in testimony from optometrists such as Dr. Dickinson, further demonstrates that there is a conflict in the evidence, and thus the issue should not be resolved on summary judgment.

Third, Dr. Dickinson's testimony is not the only evidence the United States presents in support of its claim.  In addition to Dr. Dickinson's testimony, the United States also presents testimony from several other optometrists as well.  For example, Dr. Brenner, who is a colleague of Dr. Robinson's at AEC and also provides nursing home services, testified that he performed follow-up examinations every three months for his "more severe" patients, but that he only saw his other patients every six to twelve months.  [R. 45-4 at 8.]  Doctor Brenner further testified that he believed part of why Dr. Robinson saw his patients so frequently was due to administrative convenience, which is different from medical necessity. [R. 45-4 at 33-35.] Another colleague, Dr. Stephen McKinley, testified he typically examined nursing home patients every three months, but also explained that checking on a patient to confirm that everything is all right is very different from conducting a medically necessary examination that can be billed to Medicare.  [R. 46-10 at 5-6.]  Doctor Richard Mangan, who has been an optometrist since 1991 and whose opinion was requested by Dr. Robinson's expert Dr. Karpecki, testified that fewer than 2% of his nursing home patients require an examination more frequently than every three to twelve months.  [R. 39-8.]  As explained above, Dr. Robinson as the moving party bears the

12

burden of proof to show that no genuine dispute exists and that judgment in his favor should be entered as a matter of law, but he has not met that burden on this point. The testimony to which the United States points at the very least creates a genuine issue as to the necessity of Dr. Robinson's services. This contradiction in testimony between Dr. Robinson and several other of his colleagues is a clear example of exactly the type of factual dispute that "presents a sufficient disagreement to require submission to a jury." *Anderson,* 477 U.S. at 251–52.

Moreover, the United States has also submitted the results from the review performed by Medicare contractor AdvanceMed, PSC, which concluded that only one of the twenty-four examinations included in their review was medically necessary. [R. 46-14.] This review, combined with the opinion testimony of several witnesses besides Dr. Dickinson, contradict Dr. Robinson's assertion that his decisions to perform monthly examinations were always the result of his independent medical judgment and cannot be questioned.[3] Thus, the United States has clearly gone beyond the pleadings and come forward with facts demonstrating the existence of a genuine issue in dispute. *See Hall Holding*, 285 F.3d at 424.

## D

Second, Dr. Robinson contends that the United States' FCA claims concerning two of the particularly high-volume days fail because the government cannot prove they were false and because the government cannot successfully prove the knowledge element as to Dr. Robinson for those claims. [R. 41-1 at 1, 7-10.] Doctor Robinson particularly challenges the allegations in paragraph 53 of the complaint [*id*. at 7] where the United States references two examples of high-volume days – May 28, 2008 on which Dr. Robinson claimed to provide services to 117

---

[3] Dr. Robinson argues that the Federal Regulations do not list objective criteria for when services provided to Medicare beneficiaries are reasonable and necessary. [R. 41-1 at 6 (citing 54 Fed. Reg. 4302 (Jan. 30, 1989)).] Yet the lack of specific definition of these terms is a further reason to submit such determinations to a jury.

Medicare beneficiaries, and April 16, 2009 on which he claimed to provide services to 108 Medicare beneficiaries.[4] [R. 1 at 13.]  The United States focused its claims concerning "worthless or upcoded services" only on the fifteen dates where Dr. Robinson claimed to have examined 90 or more Medicare beneficiaries.  [R. 45 at 18.]  In addition to the random sampling Dr. Dickinson examined, he also reviewed the examination forms for each of the patients Dr. Robinson purportedly examined on those fifteen "high-volume" days.  [R. 41-3 at 2; R. 45-2.]  Doctor Dickinson considered 15% of the exams performed on those days to be of some medical value.  [R. 41-3 at 12.]  As for the other 85% of the claims, Dr. Dickinson stated he "could not conclude to a reasonable degree of medical certainty that . . . the exams had no medical value, because [he] simply did not have sufficient information to reach that conclusion."  [*Id.*]  Because of that statement, Dr. Robinson contends that Dr. Dickinson's opinion testimony fails to create a genuine issue of fact that the claims submitted on the high-volume days are false, and therefore summary judgment should be granted in his favor.  [R. 41-1 at 8.]

Challenging that particular statement of Dr. Dickinson's, however, is insufficient to fulfill the burden of the moving party for purposes of summary judgment.  In the same paragraph of his report, Dr. Dickinson also stated that in his opinion, Dr. Robinson's "examinations were extremely cursory, lacked basic and essential elements, and were consistent with Dr. Robinson's practice of examining patients on a monthly basis without true medical need."  [R. 41-3 at 12.]  He further stated that "if an examination is truly necessary, it can be expected to include certain elements that may take considerable time to perform," and that where those elements were

---

[4] The Court notes that because Dr. Robinson's brief specifically challenges paragraph 53 of the complaint which lists these two dates, and because the first page of Dr. Robinson's brief states that he is challenging the United States' allegations concerning "two particular date[s] of service," the Court assumes he is referencing these two dates in particular.  [R. 41-1 at 1, 7.]  Given the rather vague nature of Dr. Robinson's assertions on this point, however, it is unclear whether his arguments apply to all of the "high-volume days" or to only these two dates, and so the Court has chosen to address the fifteen high-volume days more broadly.

lacking or were conducted in a cursory fashion, "it leads me to believe that the examinations were not really necessary, in keeping with the practice patterns I saw in the randomly selected 30 patient encounters." [*Id*. at 12-13.] Dr. Dickinson also opined that in his experience, "it is simply not possible to provide meaningful optometric examinations to 90 or more patients in an eight to nine hour period." [*Id*. at 12.] Doctor Dickinson's report then went on to further explain this conclusion and give specific examples of several recurring problems in Dr. Robinson's examinations, such as diagnosing patients with emergency conditions but then describing the condition as "stable" and doing nothing to address it. [*Id*. at 13.] He also opined that "the vast majority" of Dr. Robinson's examinations "were performed at a frequency that was not necessary." [*Id*. at 14.]

Moreover, as explained above, the testimony of Dr. Dickinson is not the only evidence the United States relies upon. The Medicare contractor AdvanceMed also used "time studies" to analyze Dr. Robinson's claims per day, and even using conservative time estimates of the services Dr. Robinson claimed to perform, AdvanceMed calculated that Dr. Robinson billed for over 24 hours of examination time per day on numerous occasions, which is physically impossible to provide. [R. 46-15 at 108-09.] This conclusion is consistent with Dr. Dickinson's opinion as well. Dr. Robinson's claims to see over 90 patients a day also vastly contrasts with the practices of several of the other optometrists discussed above. For instance, Dr. Brenner on average examined about 20 patients per day in a nursing home setting [R. 45-4 at 11], and he also testified that on the occasions when he shadowed Dr. Robinson to observe his practices, he noted that Dr. Robinson's examinations were "pretty quick" in order to see as many patients as possible in a day and were lacking in several respects. [*Id*. at 14-15.] This observation is also consistent with Dr. Dickinson's opinion. Additionally, Dr. Mangan generally examined about 30

15

patients a day in the nursing home setting [R. 39-8 at 1], and Dr. McKinley examined at most 35 to 40 patients in a day at nursing homes.  [R. 46-10 at 6.]  It would be possible from this evidence for a reasonable jury to infer that a number of Dr. Robinson's claims for Medicare payments on high-volume days were at least upcoded if not otherwise fraudulent, and at the very least the conflicting testimony creates an issue of fact that should be submitted to a jury.

Secondly, Dr. Robinson contends that the United States cannot establish the requisite scienter element for these claims on high-volume days.  [R. 41-1 at 8-10.]  In support of this argument, Dr. Robinson argues that the United States "has no proof that the mere submission of a high volume of patients on any given day" means that the claim is false.  [*Id.* at 10.]  Robinson contends that there is no statute requiring that an optometrist spend a minimum amount of time with a patient, and that Dr. Dickinson, who will testify concerning the standard of practice in the industry, does not reference any minimum time frame that must be spent with a patient.  [*Id.*]

These arguments, however, also fail to satisfy Dr. Robinson's burden as the moving party.  As explained above, the FCA does not require the United States to prove specific intent to defraud.  *See* 31 U.S.C. §3729(b)(1)(B).  Instead, the government can establish "knowingly" by showing Dr. Robinson acted with "reckless disregard" for the truth or falsity of the claims.  *See* 31 U.S.C. §3729(b)(1)(A).  Reckless disregard has been equated with gross negligence and, as explained above, can occur when acting "in deliberate ignorance of the truth or falsity of the information."  *Id.*  The United States presents several facts from which a jury could possibly infer that Dr. Robinson acted with reckless disregard or in deliberate ignorance of the truth or falsity of the billing codes he used for many of his claims.  Such examples include his common practice of waiting to complete his charts until after he had finished examinations on an entire floor or wing of a nursing home, which clearly could lead to inaccuracy.  Additionally, Dr.

16

Robinson contacted Medicare on October 25, 2006 to inquire about whether time was a factor in choosing which code to bill, and specifically asked about CPT code 99309, which typically takes about twenty-five minutes to perform.  [R. 45-8.]  Although Dr. Dickinson did not testify that a certain minimum amount of time was required for certain examinations, he did note that a retinal examination is "critical" for accurately reaching certain diagnoses, and that on the high-volume days Dr. Robinson failed to perform retinal examinations for many patients who were listed on his exam forms as having those conditions for which a retinal examination is necessary.  [R. 41-3 at 13.]  Even apart from Dr. Dickinson's testimony, however, and even in the absence of statutorily required time frames, a reasonable jury could infer Dr. Robinson's actual knowledge, or at least his reckless disregard simply from the physical impossibility of his seeking payment from Medicare for more than 24 hours of work in a single day.  [*See* R. 46-15 at 108-09.]  Thus, based on several different types of evidence the United States has presented, it would be possible for a reasonable jury to find that some number of Dr. Robinson's claims submitted to Medicare were fraudulent, and that he at least showed a reckless disregard for their veracity.

## E

Finally, Dr. Robinson contends that the United States' use of samples in order to extrapolate liability and damages is improper as a matter of law for purposes of the FCA, and that the United States must present individualized proof of each FCA element as to every single claim for Medicare payment at issue in this case.  [R. 41-1 at 11-14.]  According to Dr. Robinson, the United States should not be allowed to focus on the specifics of only 30 claims out of 25,779 in order to establish violations under the FCA or as a basis for extrapolation of damages.  [*Id.*; R. 48 at 5.]  In response, the United States argues that statistical sampling is well recognized as an appropriate means for establishing liability in a FCA case, and that to require a

17

claim-by-claim review of each of the 25,799 claims at issue here would be virtually impossible and would prevent prosecution of large-scale or complex FCA cases.  [R. 45 at 22-24.]

Contrary to Dr. Robinson's position, statistical sampling methods and extrapolation have been accepted in the Sixth Circuit and in other jurisdictions as reliable and acceptable evidence in determining facts related to FCA claims as well as other adjudicative facts.  *United States of America ex rel. Glenda Martin, et al. v. Life Care Centers of America, Inc.*, 2014 WL 4816006, *15 (E.D. Tenn. Sept. 29, 2014) (collecting cases); *see also United States v. Fadul*, 2013 WL 781614, *14 (D. Md. Feb. 28, 2013) (upholding the government's use of statisticians who based damages calculations in FCA case on a "statistical sampling and extrapolation" approach, explaining that "[c]ourts have routinely endorsed sampling and extrapolation as a viable method of proving damages in cases involving Medicare and Medicaid overpayments where a claim-by-claim review is not practical") (citing other cases); *Republic Servs., Inc. v. Liberty Mut. Ins. Co*., 2006 WL 2844122, *3 (E.D. Ky. Oct. 2, 2006) ("The applicability of inferential statistics has long been recognized by the courts.")(collecting cases). The Sixth Circuit has rejected the notion that a statistical sampling of cases cannot be used as a basis for extrapolation to a larger number of cases, especially when presenting evidence as to each individual case would be impossible. *Mich. Dep't of Educ. v. U.S. Dep't of Educ*., 875 F.2d 1196, 1205 (6th Cir. 1989) (affirming the validity of random sampling as reliable and acceptable evidence of the validity of various expenditures when an individual audit of the thousands of cases at issue would be impossible). The sample employed must be fairly representative and statistically valid, of course, but Dr. Robinson has not challenged the methodology used in acquiring the samples at issue here, nor

18

has he presented evidence showing they were not representative.[5]

Instead, Dr. Robinson contends that a claim-by-claim review of each claim at issue is required, yet he does not present any legal authority that actually supports that argument.  The only case from the Sixth Circuit cited by Dr. Robinson addresses the context of filing a FCA complaint in compliance with the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires the plaintiff to identify specific fraudulent claims in a complaint rather than simply making general allegations of a fraudulent scheme, but does not address the issue of extrapolation or statistical sampling.[6]  *See Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 878 (6th Cir. 2006) (warning that a complaint "limited to speculation and unsupported conclusion[s]" about a company's accounting methodology was insufficient for purposes of Rule 9(b)).  Here, the Court has already addressed this matter in determining that the government's complaint in this case satisfies Rule 9(b)'s requirements.  [R. 24.]

When presented with a challenge to the use of statistical samples similar to Dr. Robinson's present challenge, the Sixth Circuit reasoned that using statistical methods and a random sampling technique as a basis for making arguments about the whole was not only valid but also necessary in certain complex situations, especially when the opposing party fails to demonstrate any other feasible way of making the necessary determination.  *Mich. Dep't of Educ.*, 875 F.2d at 1205.  In doing so, the Court further cautioned that this "is not to say that the

---

[5] Robinson's Reply brief asserts that the government is improperly basing its statistical argument on "the central limit theorem," but cites to absolutely no legal or scientific authority supporting the truth of this assertion, or why even if true, the use of the central limit theorem is not an acceptable method under these circumstances. [R. 48 at 5.]

[6] Dr. Robinson also cites to a United States Supreme Court opinion, but that case dealt with the very different situation arising from the government's attempt to equate a false claim with each invoice submitted by a subcontractor that was falsely labeled as a higher quality than it actually was.  *See United States v. Bornstein*, 423 U.S. 303, 309 (1976) (finding the number of false claims should not be measured solely on the number of contracts involved instead of focusing on how many fraudulent acts were committed).  The other cases to which Robinson cites are not controlling authority, and, because they are equally inapplicable to the particular fact situation at issue here, lack persuasive value as well.  In contrast, many of the cases from other circuits to which the United States cites address the FCA context and are directly on point.

statistical model will always be conclusive.  The weight to be given to such statistical evidence is necessarily one which must be considered by the fact finder in light of the practical difficulties in obtaining a claim-by-claim review." *Id*. at 1205 (quotation and quotation marks omitted).  Here, Dr. Robinson has not presented a feasible alternative to the statistical sampling employed by the government, and the Sixth Circuit's language concerning the weight to be given such samples weighs heavily in favor of allowing this case to proceed to a jury.  To require the United States to present individual evidence on each one of the 25,799 claims at issue would be unreasonable, likely impossible, and a waste of resources.  Indeed, to take Dr. Robinson's argument to its logical conclusion would frustrate the purposes of the FCA because it would likely encourage anyone who fraudulently submitted claims to Medicare to do so in extremely large quantities so as to prevent the government from logistically being able to bring suit.

Thus, Dr. Robinson has not shown that the government's use of statistical sampling in this matter or extrapolation of damages is improper as a matter of law, and the question of the appropriate weight to give to the statistical method used is a question for a jury.  Although the exact number, if any, of claims that may be fraudulent, and the exact amount of damages, if any, may not have been definitively proven and are debatable questions, the United States has at least submitted enough evidence thus far to allow its claims to be submitted to a jury.

### III

In conclusion, when reviewing the facts and drawing all reasonable inferences in favor of the non-moving party, there are clearly triable facts at issue in this case.  *See Logan*, 259 F.3d at 566.  Because issues involving conflicting testimony, the weight of evidence, and the credibility of testimony are issues for a jury to decide, Dr. Robinson has not met his burden for purposes of summary judgment.  *Dawson*, 528 F.App'x at 452.  Accordingly, and the Court being otherwise

sufficiently advised, it is hereby ORDERED as follows:

       1.    Defendant Dr. Robinson's Motion for Summary Judgment [**R. 41**] is **DENIED**; and

       2.    The dates for the Final Pretrial Conference and Jury Trial in this matter remain as scheduled.

This 31st day of March, 2015.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**